Filed 12/16/15  P. v. DeAquino CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049671 |
| v. | (Super. Ct. No. 13CF1165) |
| EFRAIN DEAQUINO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, W. Michael Hayes, Judge.  Affirmed in part, vacated in part, and remanded with directions.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

*          *          *

# INTRODUCTION

A jury convicted Efrain DeAquino, as charged, of one count (count 1) of kidnapping for rape in violation of Penal Code section 209, subdivision (b) and one count (count 2) of forcible rape in violation of Penal Code section 261, subdivision (a)(2). As to count 2, the jury found true the allegation under Penal Code section 667.61, subdivisions (b) and (e)(1) that DeAquino kidnapped the victim in the commission of a forcible rape. Pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, the trial court struck one of two prior strike convictions for crimes committed on June 11, 1998. The court sentenced DeAquino to a prison term of 30 years to life on count 2, with a concurrent term of life with the possibility of parole on count 1.

DeAquino argues the trial court committed reversible error by permitting the prosecution to present testimony of a prior sex offense he committed in 1993. We conclude the trial court properly exercised its discretion under Evidence Code section 352 in permitting the testimony and, therefore, affirm the convictions. We also conclude the trial court properly exercised its discretion in dismissing only one of two prior strikes and reject DeAquino's argument that remand is necessary for resentencing in light of *People v. Vargas* (2014) 59 Cal.4th 635 (*Vargas*). Remand is necessary, however, for the limited purpose of determining DeAquino's ability to pay the probation report fee, restitution fine, and parole revocation restitution fine.

# FACTS

## I.

### The Charged Offense

At about 4:00 a.m. on December 10, 2000, H.R., then 19 years of age, left her home in Santa Ana to go to work cleaning an office building in the City of Orange. She walked to work because she did not have a ride. It was still dark when H.R. left, and

she was alone. About 45 minutes to an hour later, a car pulled up next to H.R. and the driver, later identified as DeAquino, offered her a ride. After telling DeAquino where she was going, H.R. got into the car and sat in the front passenger seat.

On the way toward H.R.'s work, DeAquino made a turn into the parking lot of a fast-food restaurant. H.R. became scared. The parking lot was dark and there were no other cars in it. DeAquino parked the car facing a brick wall. He took off his pants and told H.R. to take off hers. H.R. said she could not take off her pants because they were too tight. She cried as DeAquino pulled her pants and underwear down to her knees. DeAquino climbed on top of H.R. and placed his penis in her mouth. He was holding a pocketknife and told H.R., "either . . . go along with it or to do it the hard way." H.R. was afraid DeAquino would kill her and chose not to resist. He raped her and ejaculated inside her vagina. Afterwards, DeAquino used his T-shirt to clean H.R.'s vagina, and H.R. wiped herself with her own T-shirt.

DeAquino drove out of the parking lot and back onto the street. H.R. asked DeAquino to let her go. He refused and said he was going to take her someplace else. H.R. begged DeAquino to let her go and told him she had a little boy. DeAquino said he had confused her for a prostitute; H.R. told him she was not a prostitute. He said he could not leave her because she could call the police. He had taken her identification with her name and address and warned her that if she did contact the police, "something was going to happen to my family."

H.R. continued begging DeAquino to let her go. He finally changed his mind, pulled to the side of the street, and let her out of the car. H.R. walked to work, where her supervisor noticed she was "unkempt and crying" and appeared to be upset. When the supervisor asked H.R. what had happened to her, she said she had been sexually assaulted. The supervisor immediately contacted the police.

Registered nurse Toyetta Beukes conducted a sexual assault examination of H.R. During questioning by Beukes, H.R. said that she had been threatened, her vagina

3

had been penetrated by a penis, the penis had ejaculated in her vagina, and she was in pain. H.R. had been wearing two pairs of underpants, and Beukes noticed the inner pair had a red blood stain in the crotch area. The outer pair of underpants was ripped. H.R. said DeAquino had ripped them. Beukes noticed that H.R. had a scratch mark and bruise to her right shoulder, and bruising to her right upper anterior thigh, the back of her legs, and around the crease of the back of both knees. Beukes conducted a genital examination and observed trauma to H.R.'s vagina consistent with H.R.'s report of sexual assault. Beukes collected swabs from inside and outside the vagina. Beukes concluded that H.R.'s injuries were suffered within 72 hours of the examination.

When interviewed by a police officer, H.R. said that DeAquino forced her into his car. In January 2001, a police investigator contacted H.R. She told the investigator she had voluntarily got into DeAquino's car to get a ride to work and admitted she had lied when she told police officers he had forced her. H.R. did not tell the police investigator about seeing a knife in DeAquino's car.

Sperm from the vaginal swabs taken during H.R.'s sexual assault examination produced a male DNA profile that was entered into a database and compared to other DNA profiles. A match was not immediately found, so the database profiles were periodically compared. Over a decade later, in 2011, there was "a hit"—the male DNA profile obtained from H.R.'s vaginal swab matched DeAquino's DNA.

Santa Ana police officers located H.R. and interviewed her in March 2012. When shown a photographic six-pack lineup, H.R. identified DeAquino as the man who raped her in 2000. Two buccal swabs were obtained from DeAquino. DNA extracted from the swabs was compared to DNA extracted from the swabs from H.R.'s sexual assault examination. The DNA matched: There was less than a one in one trillion chance that DeAquino's DNA was not on the vaginal swab taken during H.R.'s sexual assault examination.

4

## II.

### Prior Uncharged Sexual Offense

C.T. testified that DeAquino raped her in December 1993, when she was 14 years of age. On the night of December 19, 1993, C.T. was at the home of a friend when three young men, aged perhaps 16 or 17, arrived. The men were interested in getting some crystal methamphetamine. One of the men, later identified as DeAquino, offered to go get some methamphetamine if C.T. went with him. After some coaxing, C.T. agreed to go with DeAquino, and they set off on foot. They walked about a mile to an apartment complex, where DeAquino went inside to get some methamphetamine. When he returned, he told C.T. he knew of a "kickback place" where they could "get high." They walked to a boarded-up, abandoned market not far from the apartment complex, made their way in, and, using a piece of glass to cut a line, snorted the methamphetamine. The building was dark inside and lit only by moonlight coming through crevices.

DeAquino and C.T. began to "mak[e] out." C.T. allowed DeAquino to "feel up" her shirt, but stopped him from putting his hand down her pants. He tried two more times to put his hand down her pants, and, on the third try, C.T. allowed him to fondle her vagina. After a while, DeAquino took his hand out and told C.T. to have sex with him. C.T. said she was a virgin and refused. She wanted to go home. DeAquino said, "don't make me hurt you" and, making a motion toward his pocket, told her, "I have a gun." C.T. was crying and pleaded with DeAquino not to rape her. He unzipped his pants and told C.T. to remove hers. C.T. was scared and did as she was told. DeAquino raped C.T., had her turn over, and raped her again. He shook her and told her to stop crying. When he was finished, DeAquino told C.T., "I didn't rape you because I stayed. I'm still here. So it's not rape." DeAquino asked C.T. if she wanted to clean herself; she said no.

DeAquino and C.T. walked back to the home of C.T.'s friend. DeAquino wrapped his arm around her shoulder and told her several times that he had not raped her.

C.T. tried to act "cool and casual" but she was "terrified of the whole situation." When they arrived at the friend's house, C.T. fled by climbing over a cement fence into a drainage ditch and crawling through the drainage ditch until she got to the street. C.T. walked to a friend's house. The friend and her mother took C.T. home.

C.T. told her mother what had happened. C.T. was taken to a hospital, where she underwent a sexual assault examination. Soon thereafter, she spoke with two police officers and was able to identify DeAquino from photographs they showed her.

## DISCUSSION

## I.

### Evidence of Prior Sexual Offense

DeAquino argues the trial court committed prejudicial error by permitting the prosecution to present evidence of his rape of C.T. Following lengthy argument by counsel, and over objection by DeAquino's counsel, the court granted the prosecution's motion to permit C.T. to testify about a sexual offense DeAquino committed against her in 1993. The court found the evidence would not require a trial within a trial, C.T. was subject to cross-examination, the evidence would not be "unduly prejudicial," and the evidence was being presented "exactly for the purpose for which [Evidence Code section] 1108 was passed." The trial court did not err by allowing the testimony.

A. *Law Regarding Evidence of Prior Sexual Offenses*

Under Evidence Code section 1101, evidence of specified instances of conduct is generally inadmissible, except "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . .)." (Evid. Code, § 1101, subd. (b).) Evidence Code section 1108 creates an exception to section 1101. Section 1108, subdivision (a) states: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's

6

commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

Under Evidence Code section 352, a trial court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading jury." We review the admissibility of evidence of prior sex offenses under the abuse of discretion standard. (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969.) "A trial court abuses its discretion when its ruling 'falls outside the bounds of reason.'" (*Id.*, quoting *People v. DeSantis* (1992) 2 Cal.4th 1198, 1226.)

Factors to consider in determining whether to admit evidence of other sex offenses include the "nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917.)

"[T]he probative value of 'other crimes' evidence is increased by the relative similarity between the charged and uncharged offenses, the close proximity in time of the offenses, and the independent sources of evidence (the victims) in each offense. [Citation.] . . . [T]he prejudicial impact of the evidence is reduced if the uncharged offenses resulted in actual *convictions* and a prison term, ensuring that the jury would not be tempted to convict the defendant simply to punish him for the other offenses, and that the jury's attention would not be diverted by having to make a separate

7

determination whether defendant committed the other offenses." (*People v. Falsetta*, *supra*, 21 Cal.4th at p. 917.)

B. *The Trial Court Did Not Abuse Its Discretion Under Evidence Code Section 352.*

The probative value of the prior crime evidence in this case was strong. DeAquino's rapes of H.R. and of C.T. bore significant similarities. In both cases, DeAquino initiated social contact with the victim, who was a young woman and a stranger. In both cases, DeAquino gained the woman's trust, led the woman to a dark, secluded place, and demanded sexual intercourse. When the victim refused, DeAquino used the threat of violence with a weapon (a knife or a gun) to force the woman to comply with his demands. In both cases, DeAquino raped the victim by vaginal intercourse.

Two similarities between the charged and uncharged offenses stand out and made the prior crime evidence particularly probative. First, in both cases, DeAquino was concerned about cleaning the victim after raping her. He cleaned H.R.'s vagina and had her wipe herself with her T-shirt. After raping C.T., DeAquino asked her if she wanted to clean herself. Second, in both cases, DeAquino tried to deny his actions constituted rape. He told H.R. he thought she was a prostitute and told C.T. "I didn't rape you because I stayed. I'm still here." Those two characteristics serve to differentiate DeAquino's sex offenses from other cases of rape.

C.T.'s testimony, like most evidence of prior sex offenses, potentially had a prejudicial effect on the jurors. The jury was never informed whether DeAquino was charged or convicted of any offense involving C.T. In the appellant's opening brief, DeAquino mentions that the offense was "adjudicated as a statutory rape," but he does not argue that disposition in any way made the prior crime evidence inadmissible.

Nonetheless, the degree of certainty that DeAquino committed the offense against C.T. was high. C.T. testified, in some detail, at trial and was honest and

8

forthcoming about her own drug use on the night DeAquino raped her. Further, there was little or no likelihood that C.T.'s testimony would or did confuse, mislead, or distract the jurors.

The probative value of C.T.'s testimony was not outweighed, much less *substantially* outweighed, by the probability its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. In addition, the trial court instructed the jury with CALCRIM No. 1191 on how to consider and evaluate evidence presented under Evidence Code section 1108. We presume jurors are intelligent and capable of understanding and applying the trial court's instructions. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) In sum, the trial court did not abuse its discretion under Evidence Code section 352 by allowing the prosecution to present evidence of DeAquino's sex offense against C.T.

## II.

### Prior Strike Convictions

DeAquino admitted having two prior strike convictions. He made a motion asking the trial court to exercise its discretion under Penal Code section 1385, subdivision (a) to strike at least one, if not both, of the prior strike convictions on the ground "both arise from the same single act, defendant's possession of the concealed firearm." The prosecution agreed that the prior strike convictions arose out of DeAquino's possession "of only one gun."

After hearing lengthy argument on the matter, the trial court struck one of the two prior strike convictions. The court explained that because the same act resulted in the two convictions, the appropriate thing to do was to strike one prior strike conviction and double DeAquino's term of imprisonment. The court proceeded to sentence DeAquino to a term of 15 years to life in prison, doubled due to the one remaining strike, for a total sentence of 30 years to life. (See Pen. Code, § 667.61, subd. (b).)

9

Five months after DeAquino was sentenced, the California Supreme Court issued *Vargas*, *supra*, 59 Cal.4th at pages 637, 640, 649, in which the court held that a trial court must dismiss one of two prior strike convictions based on a single act when failure to do so would be inconsistent with the spirit of the Three Strikes law. DeAquino argues remand for resentencing is appropriate because, had the trial court known it had no choice but to dismiss one of his prior strike convictions, it is reasonably probable the court would have struck both of his prior strike convictions.

We conclude the trial court would not have struck both of DeAquino's prior strike convictions under any circumstance. The trial court read the probation report and the prosecution's sentencing brief, both of which explained in detail DeAquino's life of crime. DeAquino's criminal history began in 1989, when he was 13 years old and, by the time he was 35 years old, he had been arrested for or convicted of nearly 40 crimes. Before reaching its decision on DeAquino's request to dismiss the prior strike convictions, the court heard argument on *People v. Burgos* (2004) 117 Cal.App.4th 1209, 1214 (*Burgos*), in which the Court of Appeal held that "failure to strike one of the two priors convictions that arose from a single act constitutes an abuse of discretion." The *Burgos* court reasoned: "[W]here the two priors were so closely connected as to have arisen from a single act, it would necessarily constitute an abuse of discretion to refuse to strike one of the priors." (*Id.* at p. 1215.) The prosecutor acknowledged that the trial court could dismiss both prior strike convictions and even conceded that under *Burgos*, it would be an abuse of discretion for the trial court not to dismiss one of them.

Thus, when sentencing DeAquino, the trial court had been requested to dismiss both of the two prior strike convictions and knew, based on *Burgos*, that failure to dismiss at least one of them would necessarily constitute an abuse of discretion. The trial court was aware too of DeAquino's lengthy criminal history and that courts in the past had been "cutting him the breaks." After devoting much thought to the matter, the trial court decided the "right thing to do" was to dismiss only one of the two prior strike

10

convictions and to leave one prior strike conviction intact, which would result in doubling DeAquino's sentence. Remanding this case for resentencing in light of *Vargas* would not result in the trial court striking both prior strike convictions because it is certain the court intended for DeAquino's sentence to be based upon having one prior strike.

DeAquino suggests the trial court dismissed the prior strike conviction to grant him "leniency," and, had the court known *Vargas* required the dismissal of one prior strike conviction, the court would have extended such leniency by dismissing the second prior strike conviction. The trial court did not mention leniency but stated it was dismissing one of the two prior strike convictions because both arose out of the same act of firearm possession, which made dismissal virtually required at the time under *Burgos*. If the trial court had intended to grant DeAquino some leniency, it could have dismissed both prior strike convictions at the time of sentencing.

## III.

### Probation Report Fee, Restitution Fine, and Parole Revocation Restitution Fine

As part of sentencing, the trial court ordered DeAquino to pay $2,762.67 for preparation of the probation report (Pen. Code, § 1203.1b), a restitution fine of $10,000 (*id.*, § 1202.45, subd. (b)), and a parole revocation restitution fine of $10,000 (*id.*, § 1202.45). Before ordering DeAquino to make those payments, the court commented: "The court has previously ordered the defendant to prepare a financial disclosure and warned the defendant that failure to do so could be a basis for the finding that the maximum fines should be imposed, probation denied if applicable, and imposition of the upper term could be imposed. He has chosen not to complete these documents. The court has reviewed the file and can find no prior financial declarations from the defendant on file."

According to the probation report, DeAquino had complied with the court's order by submitting an adult financial statement reflecting no assets and $20,000 in

11

liabilities.  The probation report states:  "The Probation Department has conducted a financial evaluation and has determined he does not have the ability to pay and, therefore, recommends the Court waive the costs of probation."  The probation report also recommended that DeAquino be ordered to pay a restitution fine of $2,000.

DeAquino's trial counsel did not object to the fee and fines imposed.  In *People v. Trujillo* (2015) 60 Cal.4th 850, 853-854, the California Supreme Court held that a defendant forfeits an appellate challenge to a fee imposed under Penal Code section 1203.1b by failing to object in the trial court.  DeAquino argues his trial counsel was ineffective for not objecting to the probation report fee and the restitution and parole revocation restitution fines and by not drawing the court's attention to the probation report that notes DeAquino had submitted a financial disclosure statement.  He argues the probation report fee must be stricken and the matter must be remanded for the trial court to impose the restitution fine and the parole revocation restitution fine based on his ability to pay.

The Attorney General agrees that DeAquino's trial counsel was ineffective and that "[t]his matter should be remanded to the trial court in order for the court to determine [DeAquino]'s ability to pay, and impose fines accordingly." We exercise our discretion to consider DeAquino's challenge to the probation report fee, restitution fine, and parole revocation restitution fine to avert the claim of ineffective assistance of counsel. (*People v. Crittenden* (1994) 9 Cal.4th 83, 146.)

A trial court is not permitted to impose a probation report fee unless it finds the defendant has the ability to pay. (Pen. Code, § 1203.1b, subd. (a).)  The defendant's ability to pay is a factor the trial court must consider in setting the amount of the restitution fine and parole revocation restitution fine in an amount greater than the statutory minimum. (*Id.*, § 1202.4, subds. (c) & (d).)  In this case, the trial court did not consider DeAquino's ability to pay because it mistakenly believed DeAquino had not provided a financial disclosure statement.  We therefore vacate the probation report fee,

12

restitution fine, and parole revocation restitution fine and remand to the trial court to reconsider that fee and those fines in light of DeAquino's ability to pay.

## DISPOSITION

The probation report fee, restitution fine, and parole revocation restitution fine are vacated. In all other respects, the judgment is affirmed. The matter is remanded to the trial court for the limited purpose of considering the imposition of the probation report fee, restitution fine, and parole revocation restitution fine in light of DeAquino's ability to pay.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.